# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 13, 2015

Lyle W. Cayce
Clerk

No. 14-60160

United States of America, ex rel, CORI RIGSBY; KERRI RIGSBY,

Plaintiffs-Appellants - Cross-Appellees

v.

STATE FARM FIRE & CASUALTY COMPANY,

Defendant-Appellee - Cross-Appellant

Appeals from the United States District Court
for the Southern District of Mississippi

Before STEWART, Chief Judge, and SOUTHWICK and COSTA, Circuit Judges.

CARL E. STEWART, Chief Judge:

In April 2006, Plaintiffs Cori and Kerri Rigsby (hereinafter, "the Rigsbys" or "relators") brought this qui tam action under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), claiming that State Farm Fire and Casualty Company ("State Farm") submitted false claims to the United States government for payment on flood policies arising out of damage caused by Hurricane Katrina.[1] At trial, the Rigsbys prevailed on a single bellwether false

---

[1] The FCA allows private parties, referred to as "relators," to bring a suit (called a "qui tam" suit) on behalf of the United States against anyone who has submitted false or

No. 14-60160

claim under the FCA. The district court subsequently denied their request to conduct further discovery, and denied State Farm's motions for a new trial and judgment notwithstanding the verdict. Both parties appealed. The Rigsbys primarily challenge the district court's discovery ruling and State Farm principally challenges the jury verdict. We REVERSE in part and AFFIRM in part.

## I. BACKGROUND

After Katrina, Gulf Coast residents whose homes were damaged or destroyed looked to their insurance companies for compensation. Many of these homeowners were covered by at least two policies, often provided by the same insurance company: a flood policy excluding wind damage, and a wind policy excluding flood damage. A private insurance company would frequently administer both policies, but wind policy claims were paid out of the company's own pocket while flood policy claims were paid with government funds. This arrangement generates the conflict of interest that drives this case: the private insurer has an incentive to classify hurricane damage as flood-related to limit its economic exposure.

We relate the pertinent facts in the light most favorable to the Rigsbys, as the jury rendered a verdict in their favor. *See Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 590 (2001). The Rigsbys[2] were certified, experienced claims adjusters employed by a State Farm contractor that provided disaster claims management services and claims representatives. They claimed that State Farm (other defendants have since been dismissed or settled) sought to unlawfully shift its responsibility to pay

---

fraudulent claims to the government. *See* 31 U.S.C. § 3730(b). A prevailing relator is entitled to a percentage of the recovery. *See id.* § 3730(d).

[2] Whenever used in the singular, "Rigsby" signifies Kerri Rigsby. The Rigsbys are sisters.

wind damage claims on homeowner's insurance policies to the government, through the National Flood Insurance Program ("NFIP"), by classifying damage to properties covered by both a homeowner's policy and a flood policy as flood damage instead of wind damage.

The NFIP, administered by the Federal Emergency Management Agency ("FEMA"), provides flood insurance coverage "at or below actuarial rates" in areas where it "is uneconomical for private insurance companies to provide flood insurance." *Gowland v. Aetna*, 143 F.3d 951, 953 (5th Cir. 1998). In 1983, FEMA established the "Write Your Own" Program ("WYO"), which allows participating private property and casualty insurance companies to issue, under their own names, government-backed flood insurance policies with limits of up to $250,000 for flood-based building damage and $100,000 for flood damages to personal property. *See Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d 386, 389 (9th Cir. 2000); Nat'l Flood Ins. Program, *Summary of Coverage* 1 (2012). The policies conformed to FEMA's Standard Flood Insurance Policy ("SFIP"), which generally provided coverage for flood damage but excluded coverage for wind damage. *See* 44 C.F.R. pt. 61, app. A(1), arts. I, V(D)(8). WYO insurers take a fee for administering the policy, but when claims are made, they are paid out of the federal treasury. *See Mun. Ass'n of S.C. v. USAA Gen. Indem. Co.*, 709 F.3d 276, 280–81 (4th Cir. 2013).

At all relevant times, State Farm was a participating WYO insurer. State Farm and other WYO insurers often issued, to the same customers, homeowner's policies that provided coverage for wind damage, but excluded coverage for flood damage. To address the inherent incentive to classify ambiguous damage as flood damage, regulations characterize the WYO insurer's relationship to the government as "one of a fiduciary nature." 44 C.F.R. pt. 62, app. A, art. XV.

No. 14-60160

On August 29, 2005, Hurricane Katrina struck the Gulf Coast. Shortly thereafter, State Farm set up an office in Gulfport, Mississippi, to address claims involving its policies. Alexis "Lecky" King ("King") was one of two primary Gulfport supervisors and a catastrophe coordinator with substantial experience adjusting claims. According to Rigsby's trial testimony, a meeting was convened soon after Katrina during which State Farm trainers, including King, told its adjusters that "[w]hat you will see is, you will see water damage. The wind wasn't that strong. You are not going to see a lot of wind damage. If you see substantial damage, it will be from water."

Prior to Katrina, State Farm's general policy was to conduct line-by-line and item-by-item estimates of home damages using a program called Xactimate. In the wake of Katrina, and because of the immense number of claims, FEMA authorized WYO insurers—through FEMA directive W5054— to use an expedited procedure to pay two particular types of claims: 1) claims in which a home "had standing water in [it] for an extended period of time" and 2) claims in which the home was "washed off its foundation by flood water." All other claims fell into a third category that required WYO insurers to follow their "normal claim procedures." The Rigsbys presented evidence at trial that State Farm failed to comply with that directive.

After Katrina, State Farm—rather than using Xactimate to generate a line-by-line printout of flood damages to a home—often used a program called Xactotal, which estimates the value of a home based on square footage and construction quality. State Farm told its adjusters that any time damage to a home appeared to exceed the flood policy's limits, the adjuster should use Xactotal. There was also evidence that State Farm officials told adjusters to "manipulate the totals" in Xactotal to ensure that policy limits were reached.

On September 20, 2005, a few weeks after Katrina, Rigsby and Cody Perry, another State Farm adjuster, inspected the home of Thomas and

4

Pamela McIntosh ("the McIntoshes") in Biloxi, Mississippi. The McIntoshes had two insurance policies with State Farm: a SFIP excluding wind damage, and a homeowner's policy excluding flood damage. Using Xactotal, and thereby foregoing a line-by-line estimate, Rigsby and Perry presumed that flooding was the primary cause of damage to their home. On September 29, 2005, State Farm supervisor John Conser ("Conser") approved a maximum payout of $350,000 ($250,000 for the home, $100,000 for personal property)[3] under the SFIP. Three days later, State Farm sent checks to the McIntoshes.

State Farm later retained an engineering company, Forensic Analysis Engineering Corporation ("Forensic"), to analyze the damage. Forensic engineer Brian Ford ("Ford") concluded that the damage was primarily caused by wind. His report (the "Ford Report") was prepared on October 12, 2005. But the Rigsbys presented evidence that after State Farm received it, the company refused to pay Forensic and withheld the Ford Report from the McIntosh NFIP file. A note on the Ford Report from King read: "Put in Wind [homeowner's policy] file – DO NOT Pay Bill DO NOT discuss." State Farm commissioned a second report, written by another Forensic employee, John Kelly (the "Kelly Report"). The Kelly Report determined that while there had been wind damage, water was the primary cause of damage to the McIntosh home. There was evidence that King pressured Forensic to issue reports finding flood damage at the risk of losing contracts with State Farm. Ford was subsequently fired. These events led the Rigsbys to believe State Farm was wrongfully seeking to maximize its policyholders' flood claims to minimize wind claims.

The Rigsbys brought suit under the FCA on April 26, 2006. They alleged violations of 31 U.S.C. § 3729(a)(1), (a)(2), (a)(3), and (a)(7), but only the claims

---

[3] The $100,000 that State Farm paid the McIntoshes for flood-related personal property damage is not at issue in this litigation.

under § 3729(a)(1) and § 3729(a)(2)—now codified at § 3729(a)(1)(B)—are at issue in this appeal.[4] The government declined to intervene on January 31, 2008. The district court focused discovery and the subsequent trial on the McIntosh claim, rather than permitting the Rigsbys to seek out and attempt to prove other claims, in order to "protect the interests of both parties." The district court stated that it sought to "strike a balance between the Relators' interest in identifying . . . other allegedly false claims and the defendants' interest in preventing a far ranging and expensive discovery process." The court then explained that, "[i]n the event the Relators prevail on the merits of their allegations concerning the McIntosh claim, I will then consider whether additional discovery and further proceedings are warranted." After a new district judge was assigned to this case, the Rigsbys did prevail at trial. They were aided by expert testimony from Dr. Ralph Sinno that the McIntosh home had been "wracked" by winds that completely destroyed it before the flood waters came.

The jury concluded that the McIntosh residence sustained no compensable flood damage and that the government therefore suffered damages of $250,000 under the FCA as a result of State Farm's submission of false flood claims for payment on the McIntosh property. The jury also found that State Farm submitted a false record. The district court denied State Farm's motions for judgment notwithstanding the verdict and for a new trial. The Rigsbys moved after trial for additional discovery to seek out other instances of false claims that were part of the alleged general scheme, but the

---

[4] In 2009, while the Rigsbys' claims were pending, Congress amended the FCA. *See* Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(a), May 20, 2009, 123 Stat. 1621. Most of these changes were not retroactive as applicable here. Thus, the 1994 version of § 3729(a)(1)—now § 3729(a)(1)(A)—governs the Rigsbys' false claim count. However, the 2009 version of § 3729(a)(1)(B), which was formerly § 3729(a)(2), is retroactively applicable to the Rigsbys' false record count.

court denied that motion, concluding that they had failed to plead sufficient facts about any claims unrelated to the McIntosh claim. The court, however, awarded the Rigsbys the maximum possible share under the FCA for relators pursuing claims without the government as a party—30 percent of $758,250 (the court trebled damages on the $250,000 false claim and added a civil penalty of $8,250), or $227,475. *See* § 3730(d). The court also awarded the Rigsbys $2,913,228.69 in attorney's fees and expenses. Both parties appealed.

These cross-appeals present four issues: 1) whether the Rigsbys are entitled to further discovery; 2) whether the Rigsbys' alleged violations of the FCA's seal requirement independently warrant dismissal; 3) whether the district court retained subject matter jurisdiction throughout the litigation; and 4) whether the jury's verdict was supported by sufficient evidence. We will address the applicable standards of review in each section and provide additional relevant background where necessary.

## II. DISCUSSION

### *A. Rule 9(b) and Further Discovery*

The Rigsbys seek further discovery into the same alleged scheme they argue produced the McIntosh claim. The district court denied this request, explaining that "[b]eyond the McIntosh claim, Relators' conclusory allegations in the Amended Complaint as to the existence of other specific FCA violations do not satisfy the particularity requirements of [Federal Rule of Civil Procedure] 9(b), and expanded discovery would lead to an inappropriate fishing expedition for new claims."

We review the district court's decision barring discovery for abuse of discretion. *See Moore v. CITGO Ref. & Chems. Co.*, 735 F.3d 309, 315 (5th Cir. 2013). "A district court has broad discretion in all discovery matters, and such discretion will not be disturbed ordinarily unless there are unusual circumstances showing a clear abuse." *Id.* (internal quotation marks and

citation omitted). Even if we determine that the district court has abused its discretion, "we will only vacate a court's judgment if it affected the substantial rights of the appellant." *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014) (citation omitted). Notwithstanding "this stated discretion over discovery, the lower court is directed to exercise carefully its authority in light of the intent of the federal litigation process and the federal rules. It must in discovery 'adhere to the liberal spirit of the Rules.'" Steven A. Childress & Martha S. Davis, *Federal Standards of Review* § 4.11[4] (4th ed. 2010) (quoting *Burns v. Thiokol Chem. Corp.*, 483 F.2d 300, 305 (5th Cir. 1973)); *see also* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . . For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.").

What makes this case unique is the manner in which the district court treated the Rigsbys' allegations. A limited procedural background is therefore necessary. In addressing State Farm's 9(b) motion filed early in this litigation, the district court recognized that the allegations in the Rigsbys' amended complaint went "well beyond the two specific instances of misconduct specifically identified." But the district court, "[i]n order to protect the interests of both parties," struck a "balance between the Relators' interest in identifying these other allegedly false claims and the defendants' interest in preventing a far ranging and expensive discovery process that relates only to claims that are not, for now, specifically identified." The district court then effectively sent the McIntosh claim to trial, but not before explaining that, should the Rigsbys "prevail on the merits of their allegations concerning the McIntosh claim," it would "then consider whether additional discovery and further proceedings [were] warranted."

No. 14-60160

The parties and the district court have framed this dispute as one almost entirely dependent on the application of Rule 9(b). True, complaints under the FCA must comply with Rule 9(b), which provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."[5] But Rule 9(b) is a pleading rule that would almost always come into play in pre-trial proceedings (as it did in this case). The *renewed* application of that rule in the post-trial posture here is highly unusual, if not sui generis. Indeed, the parties have not directed us to any decision applying Rule 9(b) to limit discovery after a successful trial on the merits of a "test case" fraud claim.

We do not believe that Rule 9(b) is the appropriate analytical prism through which to view the issues presented by this case. First, a court would generally, in this context, have before it a pending Rule 12(b)(6) motion to dismiss for failure to state a claim or a motion to dismiss for failure to meet the requirements of Rule 9(b). *See* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1300 (3d ed. 2015) [hereinafter Wright & Miller]. Neither were before the district court when the decision to terminate proceedings in this case was made.

Second, even if such a motion had been pending, the posture of this case has generated substantial confusion about precisely what evidence would be relevant to a Rule 9(b) determination. The parties dispute the degree to which the trial proceedings could be taken into account. The district court's decision at its core simply appears to rewind the case to the amended complaint, as though years of proceedings and a two-week trial had not taken place in the

---

[5] "Rule 9(b) supplements but does not supplant Rule 8(a)'s notice pleading," *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009), which requires "enough facts [taken as true] to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

interim. But that same amended complaint was already the subject of State Farm's futile Rule 9(b) motion discussed above. Both of these decisions look to the adequacy of the *same* complaint to determine if the case should move forward. *See Frederico v. Home Depot*, 507 F.3d 188, 201 (3d Cir. 2007) ("[W]e do not consider after-the-fact allegations in determining the sufficiency of her complaint under Rule[] 9(b) . . . ."); *Estate of Axelrod v. Flannery*, 476 F. Supp. 2d 188, 198 n.1 (D. Conn. 2007) ("Indeed, the impetus for filing a Rule 9(b) motion to dismiss is to challenge a complaint on its face."). But the decision about whether this case should move forward *after* the trial cannot be based solely on the way matters stood *before* trial. Applying Rule 9(b) here presents a square peg/round hole problem.

Third, the central purposes of Rule 9(b)—"to provide defendant with fair notice of claim, to safeguard defendant's reputation, and to protect defendant against the institution of strike suits," *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993)—appear inapplicable in this context. State Farm in this case is all too aware of the nature of the Rigsbys' allegations. It has litigated this case for nearly a decade. To the extent that the rule is designed to safeguard the defendant's reputation, that purpose is not served here: a jury already determined that State Farm committed fraud at least with respect to the McIntosh claim. Finally, there is no indication that this is a strike suit— one "based on no valid claim." *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 354 n.84 (5th Cir. 2002) (quoting Black's Law Dictionary 1448 (7th ed. 1999)). "In cases of fraud, Rule 9(b) has long played that screening function, standing as a gatekeeper to discovery, a tool to weed out meritless fraud claims sooner than later." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009); *see also* Richard L. Marcus et al., *Civil Procedure: A Modern Approach* 187 (6th ed. 2013) ("[O]ne cannot forget that Rule 9(b) is not meant

to supplant discovery." (citation omitted)). Here, the Rigsbys' claims were quite obviously not entirely "meritless."[6]

Finally, we note that we "have power not only to correct error in the judgment under review but to make such disposition on the case as justice requires.*" Patterson v. Alabama*, 294 U.S. 600, 607 (1935); *see also Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 819 (5th Cir. 2004). Consequently, we review the decision below not as a dismissal under Rule 9(b), but instead as a decision limiting discovery after a trial on the merits resulted in a jury verdict in favor of the plaintiffs on two counts of fraud.

Turning, then, to the rules applicable to requests for discovery, we start from the background principle that "the scope of discovery is broad and permits the discovery of 'any nonprivileged matter that is relevant to any party's claim or defense.'" *Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258, 262 (5th Cir. 2011) (quoting Fed. R. Civ. P. 26(b)(1)). This principle is also to be understood in light of Rule 1, which directs that the rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1. We have explained that there "probably is no provision in the federal rules that is more important than this mandate." *Trevino v. Celanese Corp.*, 701 F.2d 397, 405 (5th Cir. 1983) (internal quotation marks and citation omitted). We also are cognizant that the "FCA is remedial in nature and thus we construe its provisions broadly to effectuate its purpose."

---

[6] We hasten to add here that we have recently suggested, in the post-*Grubbs* FCA context, that additional discovery might be employed to permit plaintiffs to cure certain defects in a complaint. *See U.S. v. Bollinger Shipyards Inc.*, 775 F.3d 255, 264 n.29 (5th Cir. 2014). Additionally, at least one other circuit permits discovery on "the entire fraudulent scheme" where a relator "pleads a complex and far-reaching fraudulent scheme with particularity, and provides examples of specific false claims submitted to the government pursuant to that scheme." *U.S. ex rel. Bledsoe v. Cmty. Health Sys. Inc.*, 501 F.3d 493, 510 (6th Cir. 2007); *see also In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 171 (D. Mass. 2003) (permitting plaintiffs in fraud action to remedy deficiencies in amended complaint after completion of discovery).

No. 14-60160

*Townsend v. Bayer Corp.*, 774 F.3d 446, 459 (8th Cir. 2014) (citing *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)).

While it is indeed rare for an appellate court to reverse a denial of a request for further discovery, it is far from unprecedented. *See* 8 Wright & Miller § 2006 ("Reversal is more likely, although still unusual, when the trial court has erroneously denied or limited discovery."). And, indeed, we have reversed in circumstances where a district court inappropriately denied a party adequate discovery. *See, e.g.*, *Brown v. Miss. Valley State Univ.*, 311 F.3d 328, 333–34 (5th Cir. 2002) ("The district court did not rule on Brown's request for discovery but granted summary judgment on the grounds that there was insufficient evidence of Abraham's involvement in a conspiracy, precisely the type of evidence sought by Brown."); *Murphy v. Kellar*, 950 F.2d 290, 293 (5th Cir. 1992) (requiring that district court permit additional discovery where it may result in identification of unidentified defendants).

The Rigsbys' allegations and trial evidence—which extend far beyond the realm of the McIntosh claim—entitle them to at least some additional discovery. In their final pretrial order,[7] the Rigsbys first describe a State Farm-planned adjuster meeting they attended shortly after Katrina during which "State Farm trainers told the adjusters that Hurricane Katrina was a 'water storm' and that all major damage to homes was caused by flooding." They explain that State Farm directed its adjusters to pay policy limits under NFIP policies, and allege that "State Farm, through Alexis King and [State Farm principal FEMA contact] Juan Guevara, pushed the NFIP to relax its rules and requirements for adjusting flood claims." Using the Xactotal shortcut software

---

[7] In evaluating the Rigsbys' allegations, we look to the final pretrial order, rather than their amended complaint, because the pleadings were amended to conform to that order. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 (2007); Fed. R. Civ. P. 16(d) & advisory committee note to 1983 amendment.

(rather than the Xactimate software, which would have provided a line-by-line, item-by-item adjustment), the Rigsbys allege that "State Farm adjusted multitudes of flood claims under NFIP policies in knowing and direct violation of one of the core NFIP adjusting requirements." The Rigsbys assert that "[f]or the first time in adjusting a major hurricane, State Farm ordered engineers [to examine properties] for virtually all claims that involved flooding." Finally, they allege, "King appropriated the McIntosh engineering reports and all of the other engineering reports coming into the Gulfport office and made sure that they all conformed with State Farm's scheme to categorize all losses as caused by flooding rather than wind." These allegations touch on matters well beyond the McIntosh claim.

But our analysis does not cease with those allegations. We cannot blind ourselves to the verdict in this case and the associated record developed at trial, at least in this distinctive setting. This case presents something exceptional that most (if not all) plaintiffs in FCA cases are unable to show when seeking discovery: a jury's finding of a false claim *and* a false record. Coupled with the allegations in the final pretrial order, this "amounts to more than probable, nigh likely, circumstantial evidence" that additional false claims might have been submitted. *Grubbs*, 565 F.3d at 192. At a minimum, the trial record supports a high probability that State Farm submitted more than one false claim.

And the jury's verdict—though it referenced only the McIntosh claim—cannot be so easily limited. The jury determined that State Farm "knowingly present[ed], or cause[d] to be presented," a false claim and that the insurer "knowingly ma[de], use[d], or cause[d] to be made or used" a false record material to a false claim. 31 U.S.C. § 3729(a)(1), (a)(1)(B). State Farm contends the jury could have made this determination without finding wrongdoing beyond the McIntosh claim. But that takes too narrow a view of the Rigsbys'

evidence. Even in closing argument, as he walked the jury through the verdict form, the Rigsbys' counsel explained that they should render a verdict for Relators on the § 3729(a)(1) claim because of "all the scheme type evidence that we've been putting on" and on the § 3729(a)(1)(B) claim because of the Xactotal form.

With respect to the § 3729(a)(1) claim, the Rigbys presented evidence at trial that State Farm told its adjusters that the post-Katrina damage they would see would be flood damage, that they should "hit the limits" on flood policies, and that they should use Xactotal in these circumstances rather than FEMA directive W5054's required line-by-line estimate. These general allegations, extending beyond the McIntosh claim, were fervently litigated during the trial.

The verdict on the § 3729(a)(1)(B) claim is perhaps even more suggestive of additional claims. State Farm did not quarrel with whether the Xactotal printout had in fact been placed in the McIntosh NFIP file; witnesses testified to widespread use of Xactotal in adjusting Katrina claims. Its argument was that the document was not a false record within the meaning of § 3729(a)(1)(B) because State Farm had *generalized permission* to deviate from FEMA directive W5054 if the loss appeared to exceed the coverage limit. The jury's verdict necessarily entailed a finding that this was not so.

"In pursuing traditional or test case trials, the judge may conduct a unitary trial, bifurcate liability and damages, or create other helpful trial structures." *Manual for Complex Litigation* § 22.93 (4th ed. 2015). But a "court must identify and minimize any risk of unfairness in requiring litigants to present claims or defenses in a piecemeal fashion." *Id.* The district court appropriately employed its discretion to isolate the McIntosh claim for trial. But in denying the Rigsbys *any* additional discovery after a verdict in their favor, the district court abused its discretion in a manner that affected their

substantial rights. *See Green*, 754 F.3d at 329; *see also Burns*, 483 F.2d at 305 (requiring that administration of discovery remain consistent with "the liberal spirit of the Rules"). The Rigsbys' allegations in the final pretrial order and the verdict on the McIntosh claim provide sufficient justification to permit additional limited discovery. While the typical case might warrant shutting the door to more discovery, the Rigsbys have at least edged the door ajar for some additional, if superintended, discovery.

We emphasize that our decision hinges in large part on the idiosyncratic nature of this case—seldom will a relator in an FCA case present an already-rendered jury verdict in her favor while seeking further discovery. We therefore remand to the district court for further proceedings not inconsistent with this opinion, but stress that we make no judgments about the actual existence of other potential false claims or records.[8]

### *B. Seal Violations*

Turning to the cross-appeal, State Farm argues that the Rigsbys' violations of the FCA's seal requirement independently warrant dismissal. The FCA requires that a "copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the government." 31 U.S.C. § 3730(b)(2). The complaint must be filed in camera and remain under seal until the court orders it served on the defendant. *Id.* Whether a violation of this requirement compels dismissal presents a statutory interpretation question reviewed de novo. *See U.S. ex rel. Summers v. LHC Grp. Inc.*, 623 F.3d 287, 291 (6th Cir. 2010). The requirements of § 3730(b)(2) are procedural, not jurisdictional. *See* Claire M.

---

[8] We are sympathetic to the district court's fear of unconstrained discovery. To that end, a reasonable place to begin would be to allow the Rigsbys access to a list that State Farm already prepared in response to the district court's request to review in camera certain materials in its August 10, 2009, order.

No. 14-60160

Sylvia, *The False Claims Act: Fraud Against the Government* § 11:14 (2d. ed. 2010) [hereinafter Sylvia, *Fraud Against the Government*] (collecting cases).

Although this is an issue of first impression in this court, three circuits have addressed the consequences of an FCA seal violation and come to divergent conclusions. In *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, the plaintiff filed her FCA suit under seal but subsequently disclosed, to a national newspaper, the existence of the suit and the nature of her allegations about a government contractor mischarging for its work on a plane's radar system. 67 F.3d 242, 243–44 (9th Cir. 1995). Two articles were subsequently published revealing that the suit had been filed and relaying the substance of the claims. *Id.* at 244. The district court dismissed the suit because of the seal violations. *Id.* at 243.

The Ninth Circuit reversed. *Id.* at 243, 247. The court determined that no provision in the FCA explicitly authorizes dismissal as a sanction for a seal violation. *Id.* at 245. The court then looked to the legislative history surrounding the passage of the 1986 amendments to the FCA that added the seal provision, and determined that Congress sought to strike a balance between encouraging private FCA actions and allowing the government an adequate opportunity to evaluate whether to join the suit. *Id.* (citing S. Rep. No. 99-345, at 23–25 (1986)). The *Lujan* court concluded that the plaintiff had violated the seal requirement, but remanded with instructions for the district court to evaluate three factors in determining whether dismissal was warranted: 1) the harm to the government from the violations; 2) the nature of the violations; and 3) whether the violations were made willfully or in bad faith. *Id.* at 245–47. The Second Circuit adopted a similar analysis in *U.S. ex rel. Pilon v. Martin Marietta Corp.*, 60 F.3d 995, 997, 999–1000 (2d Cir. 1995).

By contrast, the Sixth Circuit held that any violation of the seal requirement, no matter how trivial, requires dismissal. *See Summers*, 623 F.3d

at 299. The *Summers* court determined that Congress's choice of a 60-day seal period already reflected legislative balancing of the interests identified by the *Lujan* court. *See id.* at 296. The *Summers* court also feared that a balancing test would encourage "plaintiffs to comply with the FCA's under-seal requirement only to the point the costs of compliance are outweighed by the risk" of dismissal. *Id.* at 298.

While cognizant of the justification for and the merits of a per se rule, we conclude that a seal violation does not automatically mandate dismissal. As the *Lujan* court recognized and the government stated as amicus in this case, nothing in the text of § 3730(b)(2) "explicitly authorizes dismissal as a sanction for disclosures in violation of the seal requirement." 67 F.3d at 245. Perhaps more essentially, though, the 1986 amendments to the FCA were intended to encourage more, not fewer, private FCA actions. *See* S. Rep. No. 99-345, at 1–8, 23–25. Holding that any violation of the seal requirement mandates dismissal would frustrate that purpose, particularly when the government suffers minimal or no harm from the violation. We therefore embrace the *Lujan* test for addressing violations of § 3730(b)(2) and turn to the relevant facts here. We review the district court's application of the *Lujan* factors, and its election of a remedy for a seal violation, for abuse of discretion. *See Lujan*, 67 F.3d at 247 ("Imposition of dismissal as a sanction is reviewed for abuse of discretion."); *Pilon*, 60 F.3d at 1000.

The Rigsbys filed their initial complaint under seal on April 26, 2006, and served a copy to the government. State Farm alleges that the Rigsbys' prior counsel then disclosed the existence of the lawsuit to several news outlets by emailing copies of the evidentiary disclosures and engineering reports, sometimes including the case caption. State Farm also alleges that the Rigsbys themselves sat for interviews that culminated in the publication of multiple news stories—including one interview that was the subject of a national

No. 14-60160

broadcast on ABC's 20/20 program—and notified a Mississippi congressman of their FCA action. Most of these events occurred before the seal was partially lifted on January 10, 2007, to allow the Rigsbys to address related litigation in Alabama. The seal was fully lifted on August 1, 2007.

First, we limit the scope of our inquiry to the period between the filing of the complaint and the partial seal lift. Indeed, while neither party appears to have scrutinized the docket in the related litigation, the existence of this qui tam litigation was revealed there in another party's public filings within days of the partial seal lift. *See E.A. Renfroe & Co. v. Cori Rigsby Moran et al.*, No. 2:06-cv-01752 (N.D. Ala. Jan. 18, 2007), ECF No. 85. This effectively mooted the original seal. We also confine our analysis to disclosures of the existence of the suit itself, and do not consider disclosures of the underlying allegations. *See Am. Civil Liberties Union v. Holder*, 673 F.3d 245, 254 (4th Cir. 2011) ("[T]he seal provisions limit the relator only from publicly discussing the filing of the qui tam complaint. Nothing in the FCA prevents the qui tam relator from disclosing the existence of the fraud.").

Having closely reviewed each of the disclosures offered by State Farm that fall into the aforementioned time period and relate to the existence of the FCA suit,[9] we first conclude that the Rigsbys violated § 3730(b)(2). They conceded as much at oral argument. But we agree with the district court's determination that none of the disclosures appear to have resulted in the publication of the existence of this suit before the seal was partially lifted. Applying the *Lujan* factors, then, we conclude first that the government was not likely harmed. If State Farm was not tipped off about the existence of the suit from the Rigsbys' disclosures, a fundamental purpose of the seal

---

[9] We assume, without deciding, that: 1) disclosures by the Rigsbys' prior counsel, who were later disqualified, can be imputed to them; 2) disclosures to a sitting congressman can violate § 3730(b)(2); and 3) State Farm has standing to seek dismissal under § 3730(b)(2).

requirement—allowing the government to determine whether to join the suit without tipping off a defendant—was not imperiled. *See Lujan*, 67 F.3d at 245–46; *U.S. ex rel. Le Blanc v. ITT Indus., Inc.*, 492 F. Supp. 2d 303, 307–08 (S.D.N.Y. 2007); S. Rep. No. 99-345, at 24.

Second, the violations here—unlike those in many other cases that resulted in dismissal, *see e.g.*, *Taitz v. Obama*, 707 F. Supp. 2d 1, 4 (D.D.C. 2010); *Erickson ex rel. U.S. v. Am. Inst. of Biological Scis.*, 716 F. Supp. 908, 911–12 (E.D. Va. 1989)—did not involve a complete failure to file under seal or serve the government, and were therefore considerably less severe. *See Lujan*, 67 F.3d at 246. We acknowledge that some of the above-mentioned publications revealed that the Rigsbys turned over material to federal and state prosecutors. But each reference to those disclosures is in the context of allegations about State Farm misleading policyholders, not the federal government. The distinction is significant because the revelation of possible private or public enforcement to protect policyholders would not alert State Farm to a pending FCA suit.

With respect to bad faith, the district court determined that "there is nothing in the record to suggest that the disclosures in question . . . were authorized by or made at the suggestion of the Relators," and held that a finding of bad faith or willfulness was unwarranted. There is no indication that the Rigsbys themselves communicated the existence of the suit in the relevant interviews. Were we to impute their former attorneys' disclosures to them, however, we would conclude that they acted in bad faith. Even presuming bad faith, the *Lujan* factors favor the Rigsbys. Although they violated the seal requirement, the Rigsbys' breaches do not merit dismissal.

## C. Subject Matter Jurisdiction

State Farm next challenges the district court's determination that it had subject matter jurisdiction over this action. Where the underlying allegations

of a suit have been the subject of a "public disclosure," a court lacks subject matter jurisdiction to hear the suit unless the relator is an "original source" of the information. *See* 31 U.S.C. § 3730(e)(4).[10] Whether § 3730(e)(4) bars a complaint is a question of subject matter jurisdiction. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 467 (2007). Assuming *arguendo* that a public disclosure occurred, as the district court did, we conclude that the district court properly retained jurisdiction because the Rigsbys are original sources.

A "challenge under the FCA jurisdictional bar is necessarily intertwined with the merits and is, therefore, properly treated as a motion for summary judgment." *U.S. ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 173 (5th Cir. 2004) (internal quotation marks and citation omitted). "Summary judgment will be granted if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *U.S. ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 326 (5th Cir. 2011) (citations omitted).

In relevant part, § 3730(e)(4)(A) reads: "No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions" in a civil hearing or in the news media "unless . . . the person bringing the action is an original source of the information." An "original source" is "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." § 3730(e)(4)(B). "Direct" knowledge is "derived from the source without interruption or gained by the relator's own

---

[10] This section was substantively amended in 2010, but the new version does not apply to cases, like this one, that were already pending at the time of its enactment. *See Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 283 n.1 (2010).

efforts rather than learned second-hand through the efforts of others." *U.S. ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 336 F.3d 346, 355 (5th Cir. 2003) (citation omitted) *abrogated on other grounds by Rockwell*, 549 U.S. at 472. Knowledge is "independent" when "it is not derived from the public disclosure." *Reagan*, 384 F.3d at 177 (citations omitted).

In evaluating whether a relator has "direct and independent knowledge," we "must look to the factual subtleties of the case before [us] and attempt to strike a balance between those individuals who, with no details regarding its whereabouts, simply stumble upon a seemingly lucrative nugget and those actually involved in the process of unearthing important information about a false or fraudulent claim." *Laird*, 336 F.3d at 356. The relator's contribution must "translate into some additional compelling fact, or must demonstrate a new and undisclosed relationship between disclosed facts, that puts a government agency 'on the trail' of fraud, where that fraud might otherwise go unnoticed." *Reagan*, 384 F.3d at 179 (citations omitted). Significantly here, the court must retain subject matter jurisdiction at all times throughout the litigation. "The court can lose jurisdiction over an otherwise sound action if the relator amends his complaint to remove the basis of the jurisdiction." *See Jamison*, 649 F.3d at 327–28 (citing *Rockwell*, 549 U.S. at 473–74). Conversely, the "amendment process cannot be used to create jurisdiction retroactively where it did not previously exist." *See id.* at 328 (internal quotation marks and citation omitted).

Turning to the facts, two relevant clusters of disclosures occurred before the Rigsbys filed their initial complaint in April 2006. First, in September 2005, a different set of plaintiffs filed a class action complaint (the "Cox/Comer Complaint") against 100 unnamed insurance companies and seven named ones, including State Farm. That suit alleged that insurers were engaged "in an effort to save money and pass on the costs of the loss to the federal flood

21

insurance program" by misclassifying "storm related activity other than flooding"—including wind damage—as flood-related. The suit focused on the Mississippi Coast. In January 2006, the Cox/Comer plaintiffs filed a second amended complaint, alleging that damages were "caused by the hurricane winds . . . that preceded the arrival of water by a sufficient amount of time that the destruction had already occurred prior to the arrival of floodwaters."

Second, on October 18, 2005, and February 2, 2006, former NFIP administrator J. Robert Hunter testified before a U.S. Senate committee about, among other topics, the conflict of interest WYO insurers adjusting Katrina claims faced in determining whether property damage was caused by wind or water. Hunter explained that "even though a property may have been washed away by the storm surge, it was likely first hit by heavy winds, so that by the time the water wiped out the property, some percentage of the property was already destroyed by wind and rain." Hunter called for the Government Accountability Office to audit the allocations "so that any tendency of the insurers to diminish their wind losses for their own benefit is stopped quickly." He did not name State Farm.

Assuming *arguendo* that these were public disclosures within the meaning of § 3730(e)(4)(A), we look first to whether the Rigsbys were original sources with direct and independent knowledge of the information in their original complaint. *See Jamison*, 649 F.3d at 327, 332. Although the Cox/Comer Complaint and the Hunter testimony did reveal some of the information coloring the background of this litigation, the Rigsbys' personal, first-hand experiences filled in much of the detail, particularly as it related to the McIntosh claim, and certainly amounted to more than a "seemingly lucrative nugget" that they "simply stumble[d] upon." *Laird*, 336 F.3d at 356. The Rigsbys allege in their original complaint that: 1) they were told to use the "shortcut" Xactotal software even on claims that "sustained moderate flood

No. 14-60160

damage"; 2) they were told to manipulate the information entered into Xactotal if the initial analysis did not result in a full payout under the flood policy; and 3) Rigsby discovered the wind-focused Ford Report as well as King's "DO NOT Pay Bill DO NOT discuss" note attached to that document and the subsequent flood-focused Kelly Report. These allegations were sufficient to confer original source status upon the Rigsbys at the outset of the case.

We next look to whether the Rigsbys' status as original sources was divested by the pursuit of a different theory at trial, as State Farm argues. This is precisely what happened in *Rockwell*. In that case, a relator brought an FCA suit against his former employer, a government contractor operating a nuclear weapons plant, after a toxic waste leak. 549 U.S. at 460–64. His original complaint alleged the leak was rooted in a process for mixing the waste that he had predicted during his employment would fail because of a piping defect. *Id.* at 461. However, the theory the government developed after it intervened in the case (and upon which it was successful at trial) was that—after the relator himself had already left the company—a foreman caused the leak by using an improper waste mixture. *Id.* at 461–65. The Court determined that because the only false claims found by the jury related to the period *after* the relator had left the company, and were rooted not in the relator's predicted piping failure but instead in a foreman's improper mixture, he had no direct and independent knowledge of the defect. *Id.* at 475–76. The district court therefore lacked jurisdiction to enter judgment in the relator's favor. *Id.* at 479.

But the facts here differ substantially from those in *Rockwell*. The *Rockwell* Court looked to the final pretrial order to evaluate jurisdiction and observed that it had become unmoored from the original allegations underlying the complaint. *See id.* at 474–76. But the final pretrial order in this case is replete with allegations about which the Rigsbys had direct and independent knowledge. The Rigsbys allege in the final pretrial order, for example, that: 1)

State Farm told adjusters to use Xactotal to "hit the limits" of flood policies; 2) adjuster Cody Perry handed Kerri Rigsby the Ford Report, which contained King's note; and 3) the Rigsbys attended an adjuster meeting convened by State Farm during which the company's trainers told the adjusters that Katrina was a "'water storm' and that all major damage to homes was caused by flooding." These allegations formed the basis of much of the trial and they do not significantly diverge from the Rigsbys' original allegations.

State Farm is correct that the Rigsbys relied on Dr. Ralph Sinno's "wracking" theory at trial, but wracking is not a "theory of fraud" about which the Rigsbys could have been whistleblowers. As detailed above, the Rigsbys alleged that State Farm fraudulently misclassified wind damage as flood damage through a variety of means. State Farm sought to refute the Rigsbys' allegations of fraud by arguing that water was in fact the cause of the damage to the McIntosh home. Dr. Sinno's wracking theory countered that defense by explaining how wind actually would have caused the damage first. The wracking theory was part of the proof by which the Rigsbys convinced the jury of the predicate fact that wind caused the damage to the McIntosh home. *See Rockwell*, 549 U.S. at 475 ("[A] *qui tam* relator's misunderstanding of *why* a concealed defect occurred would normally be immaterial . . . ."); Sylvia, *Fraud Against the Government* § 11:63. In any event, the wracking theory was consistent with the allegations of fraud the Rigsbys presented in their complaint and final pretrial order. Indeed, when asked to summarize his theory of how the McIntosh home was destroyed, Dr. Sinno stated: "I agree fully with the first conclusion of the first inspector from State Farm," that is, Ford.

The Rigsbys are the "paradigmatic . . . whistleblowing insider[s]." *U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 287 F. App'x 396, 401 (5th Cir. 2008) (internal quotation marks and citation omitted); *see also* Sylvia, *Fraud Against*

*the Government* § 11:62; John T. Boese, *Civil False Claims and Qui Tam Actions* § 4.02[D][3][a] (4th ed. 2014) ("[K]knowledge acquired and witnessed during the course of employment or professional work is direct knowledge.").[11] Their direct knowledge surpasses that presented by other would-be relators in our original source case law. *Compare Jamison*, 649 F.3d at 331–32 (holding that relator who "describe[d] a general scheme of fraud and then list[ed] arbitrarily a large group of possible perpetrators" was not an original source); *U.S. ex rel. Fried v. West Indep. Sch. Dist.*, 527 F.3d 439, 440, 443 (5th Cir. 2008) (holding that relator was not an original source where he was a government-waste opponent who sought to infiltrate a school district to root out retiring teachers' alleged social security fraud); *Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 448–49, 451–52 (5th Cir. 1995) (holding that relators who brought suit against a competitor and other defendants were not original sources). The Rigsbys' knowledge was also independent because their contributions put the government "on the trail of fraud" that "might otherwise [have gone] unnoticed." *Reagan*, 384 F.3d at 179. Even the most zealous government investigator would not likely have been able to pinpoint the McIntosh claim—which was the basis of the trial—from the Cox/Comer Complaint and the Hunter testimony. Thus, the Rigsbys are original sources.

It is plausible that § 3730(e)(4) might come into play again as the district court proceeds with this litigation. *See Rockwell*, 549 U.S. at 473, 476 (recognizing that subject matter jurisdiction can be questioned at any time and

---

[11] Cori Rigsby's status as an original source in this case is more tenuous because she lacked direct and independent knowledge of the specifics of the McIntosh claim. However, we are satisfied that her contributions to the action permit the court to retain subject matter jurisdiction over her claims. Like her sister, Cori Rigsby was an experienced adjuster working for a State Farm contractor. She was instructed by State Farm that Katrina was a "water storm"; she was told to use Xactotal rather than Xactimate; and she knew about engineers altering their reports. Cori Rigsby, too, was a "paradigmatic . . . whistleblowing insider." *Tenet Healthcare Corp.*, 287 F. App'x at 401 (internal quotation marks and citation omitted).

with respect to any claim). We emphasize that there has been no finding of a public disclosure in this case under § 3730(e)(4)(A). However, even if the district court on remand should find a public disclosure touching on any possible claims, the Rigsbys would not necessarily be barred from pursuing those claims if they remain qualified as original sources under § 3730(e)(4)(B).

### *D. Jury Verdict*

State Farm's cross-appeal in this case lastly aims to unravel the jury's verdict in favor of the Rigsbys on the McIntosh claim. The jury found that State Farm was liable under § 3729(a)(1) (false claim liability) and § 3729(a)(1)(B) (false record liability), and the district court denied State Farm's motions for judgment as a matter of law. We conclude that a reasonable jury could have rendered these verdicts.

"Although we review denial of a motion for judgment as a matter of law de novo . . . our standard of review with respect to a jury verdict is especially deferential." *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 874 (5th Cir. 2013) (internal quotation marks and citation omitted). The district court only errs where "the evidence at trial points so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1323 (5th Cir. 1994). While "the court should review all of the evidence in the record," it "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

The Rigsbys' first count is for a violation of § 3729(a)(1), the applicable version of which premises liability on "knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." § 3729(a)(1). To succeed on their false record claim, the Rigsbys had to prove that State Farm "knowingly

ma[de], use[d], or cause[d] to be made or used, a false record or statement material to a false or fraudulent claim." § 3729(a)(1)(B).

State Farm argues that no reasonable jury could find: 1) that the McIntosh claim was false; 2) that State Farm had the requisite guilty knowledge; or 3) that there was evidence of a false record or statement. State Farm's first two challenges affect both counts, while its third affects only the false record count. We take each challenge in turn.

### i. Falsity of the McIntosh Claims

To prove a violation of both § 3729(a)(1) and § 3729(a)(1)(B), the Rigsbys had to show that the claim presented for payment on the McIntosh's flood policy was false. A claim includes "any request or demand, whether under a contract or otherwise, for money or property." § 3729(c).[12] And this court has explained that a claim "for money or property to which a defendant is not entitled [is] 'false' for purposes of the False Claims Act," and "whether a claim is valid depends on the contract, regulation, or statute that supposedly warrants it." *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 674–75 (5th Cir. 2003) (en banc). Here, the issue is whether State Farm appropriately determined that the flood insurance contract—derived word-for-word from a federal regulation, and containing an exclusion for wind damage—permitted the full $250,000 payout for flood damage to the McIntosh home.

State Farm primarily contends that evidence of flood damage permeated the case, and that the Rigsbys failed to adequately support their trial theory that the home was rendered a total loss by wind before the flood waters arrived. We conclude a reasonable jury could find that the McIntosh claim was false, and, more specifically, could have believed that the home was destroyed by Katrina's winds before the water arrived.

---

[12] The definition has since been amended, but this language is unchanged.

No. 14-60160

At the outset, we disagree with State Farm that the Rigsbys were required to present expert valuation evidence. We have already held that evidence of valuation can include—besides expert evidence—adjusters' reports and a plaintiff-insured's deposition testimony. *See Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 360, 363 (5th Cir. 2010); *see also* 17A Couch on Insurance § 255:52 (3d ed. 2014) ("The question of value, for purposes of estimating the loss under [a] policy, is more or less one of expert opinion, but witnesses testifying as to the value of property are not required to be expert or skilled in the strict sense of the term in order to express an opinion on value.").

The Rigsbys' most significant valuation evidence came from Dr. Ralph Sinno, a professor of structural civil engineering.[13] Dr. Sinno, after personally inspecting the property, testified that:

> [T]he McIntosh house was damaged by the hurricane wind way before even the water got into the threshold of the house. The water did not get into the threshold of the house until two hours after the peak wind. After two hours, after all of the damage has been done, the water got to the house.

Dr. Sinno testified in detail about how winds "demolished, twisted, and wracked" the McIntosh home, and he defined wracking as "deform[ing] and mov[ing] [the structure] horizontally due to horizontal forces." Dr. Sinno's testimony aligned with that of Brian Ford (the Forensic employee who concluded in a report shortly after the storm that the primary cause of damage to the McIntosh home was wind), and it was corroborated by additional expert

---

[13] State Farm alleges that the district court abused its discretion by permitting Dr. Sinno to testify under *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993). "District courts enjoy wide latitude in determining the admissibility of expert testimony, and the discretion of the trial judge and his or her decision will not be disturbed on appeal unless manifestly erroneous." *Hodges v. Mack Trucks Inc.*, 474 F.3d 188, 194 (5th Cir. 2006) (internal quotation marks and citation omitted). The district court cogently and thoroughly evaluated Dr. Sinno's qualifications, expertise, and opinions in ruling on State Farm's motion in limine. There was no abuse of discretion in permitting the jury to hear his testimony.

and witness testimony. While Dr. Sinno is not a valuation expert, as State Farm forcefully argues and Dr. Sinno himself conceded, his expertise in structural engineering qualified him to opine on whether the home was structurally destroyed. *See* 17A Couch on Insurance § 255:52.

State Farm argues that many witnesses—including some of the Rigsbys' own—testified that there had been flood damage to the home. That is certainly true (though much of that damage could have occurred *after* the wind rendered the home a total loss, or it could relate to the contents of the home, for which the McIntoshes were reimbursed an unchallenged $100,000). But, as the district court correctly recognized, "it is the function of the jury as the traditional finder of the facts, and not for the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 692 (5th Cir. 2012) (internal quotation marks and citation omitted). A reasonable jury could have concluded that the house was a total loss before the flood waters arrived. Certainly the evidence does not point "so strongly and overwhelmingly in [State Farm's] favor that reasonable jurors could not reach a contrary conclusion." *Omnitech*, 11 F.3d at 1323.[14]

---

[14] The parties dispute whether State Farm's alleged violation of FEMA directive W5054 can independently support the jury's verdict. State Farm contends that compliance with W5054 was not an express condition or prerequisite for payment of the claim. *See U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir. 2010) ("Not every breach of a federal contract is an FCA problem. We have thus repeatedly upheld the dismissal of false-certification claims (implied or express) when a contractor's compliance with federal statutes, regulations, or contract provisions was not a 'condition' or 'prerequisite' for payment under a contract."). The Rigsbys contend that this is not a false certification case that would require concluding that compliance with W5054 was a prerequisite for payment of a claim. Even were we to agree with State Farm that compliance with W5054 must be a prerequisite for payment in this context, FEMA regulations emphasize that WYO insurers "shall comply with written standards, procedures, and guidance issued by FEMA." 44 C.F.R. pt. 62, app. A, art. II(G)(1); *see also* 44 C.F.R. pt. 62, app. A, art. II(A)(2) ("Companies will also be required to comply with . . . guidance authorized by . . . [FEMA]."). Additionally, directive W5054 itself states that the "NFIP's general adjusters will be involved in closely monitoring the performance and procedures of the WYO carriers utilizing this process," signifying that

No. 14-60160

*ii. Scienter*

State Farm next argues that the Rigsbys failed to prove the requisite degree of scienter. Violations of both § 3729(a)(1) and § 3729(a)(1)(B) require intent, or scienter. A person must have actual knowledge of the truth or falsity of information, act in deliberate ignorance of the truth or falsity of information, or act in reckless disregard of the truth or falsity of information. *See* § 3729(b). Proof of specific intent is not required, though negligence or gross negligence is insufficient. *See id.*; *U.S. ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 468 (5th Cir. 2009).

State Farm first argues that that the evidence of knowledge was insufficient because the three adjusters assigned to the claim—Rigsby, Cody Perry, and John Conser (the State Farm supervisor and team leader who ultimately made the decision to pay the McIntosh flood claim on October 2, 2005)—all shared a good faith belief at the time the claim was submitted that the McIntosh home suffered $250,000 in flood damage. Further, State Farm argues, there is no indication that anyone besides these individuals knew the details of the McIntosh claim before it was paid.

But State Farm's constricted theory of FCA liability would enable managers at an organization to concoct a fraudulent scheme—leaving it to their unsuspecting subordinates to carry it out on the ground—without fear of reprisal. The FCA is not so limited. First, the statute provides for liability where a defendant knowingly "causes to be presented" a false claim or knowingly "cause[s]" a false record to be made or used. § 3729(a)(1), (a)(1)(B). That is, the statute by its plain text permits liability without a direct falsity. Second, courts have rejected "ignorant certifier" defenses like this one. A

FEMA took compliance seriously. Finally, FEMA officials testified that line-by-line estimates were in fact a prerequisite to payment under the NFIP.

textbook example comes from *Grand Union Co. v. United States*, 696 F.2d 888 (11th Cir. 1983). In that case, cashiers at a grocery store allegedly assisted customers in defrauding the federal food stamp program, but the head cashier who actually submitted the false claims knew nothing of the scheme. *Id.* at 889–90. The court reversed a grant of summary judgment for the defendant grocery store on an FCA claim, holding that liability could attach to a corporation under the FCA despite the certifier's good faith belief in the validity of the certification. *Id.* at 891; *see also U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 920 n.12 (4th Cir. 2003) ("[A] corporation can be held liable under the FCA even if the certifying employee was unaware of the wrongful conduct of other employees.").

State Farm contends, however, that *Grand Union* and *Harrison* still require that at least one State Farm employee have knowledge that a claim is false. Because there is no indication that the alleged perpetrators of the scheme knew the details of the McIntosh claim *before* its submission,[15] State Farm argues, it cannot be held liable. The Rigsbys counter that they identified perpetrators of the scheme: Lecky King (the "architect and enforcer"); Juan Guevara (who confirmed in an email that State Farm knew FEMA directive W5054 required line-by-line estimates in circumstances like this one); and

---

[15] Lecky King's alleged manipulation of the McIntosh engineering reports occurred *after* the McIntosh claim was paid. The Rigsbys have abandoned their reverse false claim allegation under § 3729(a)(7), which would sanction recovery for certain actions taken to "conceal, avoid, or decrease an obligation" to the government. § 3729(a)(7). Consequently, State Farm cannot be liable in this suit for any failure to reimburse the government for improperly transmitted funds. However, simply because an action took place after the fraud does not render it wholly irrelevant in determining whether there was sufficient knowledge, before the claim or record was submitted, to impose liability under § 3729(a)(1) or § 3729(a)(1)(B). Circumstantial evidence is appropriate in determining scienter in an FCA case, *see United States v. Aerodex, Inc.*, 469 F.2d 1003, 1007–08 (5th Cir. 1972), and the jury was entitled to use post-payment evidence to evaluate State Farm's pre-payment knowledge.

Jody Prince (a State Farm trainer who wrote in an email that State Farm adjusters should "manipulate the totals" and "write Policy limits").

In this case, there was evidence that adjusters were effectively told to presume flood damage instead of wind damage. There was also evidence that State Farm knowingly violated W5054, concealed evidence of wind damage, and strong-armed an engineering firm to change its reports. Even if we were to agree with State Farm that one individual must have knowledge that a claim is false, the jury could have reasonably believed that King alone, "act[ing] in reckless disregard of the truth or falsity" of the information, 1) caused a false claim to be presented for payment, and 2) caused a false record material to a false claim to be made or used. § 3729(a)(1), (a)(1)(B), (b). State Farm's liability—premised on this knowledge—does not make the company "answerable for anything beyond the natural, ordinary and reasonable consequences of [its] conduct." *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 672 (2008) (internal quotation marks and citation omitted).

State Farm's final allegation with respect to scienter is that the government's knowledge and approval of its actions—through FEMA and NFIP witnesses who testified to a desire to streamline the flood claim process—precludes a finding of guilty knowledge. Where the government "knows and approves *of the particulars of a claim for payment* before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim." *U.S. ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 491 F.3d 254, 263 (5th Cir. 2007) (emphasis added) (internal quotation marks and citation omitted). State Farm nowhere alleges that any FEMA official had particularized knowledge of the McIntosh claim. There are only general allegations that FEMA was behind State Farm's effort to pay flood claims quickly. But FEMA's desire to have valid claims paid out quickly does not translate into a license to pay invalid claims. We conclude that a reasonable

jury could believe that State Farm had the requisite scienter to support violations of § 3729(a)(1) and § 3729(a)(1)(B).

### iii. False Record or Statement

The second relevant count in this case is for a violation of § 3729(a)(1)(B), which requires the knowing submission of a "false record or statement material to a false or fraudulent claim." The term "material" is defined broadly to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." § 3729(b)(4). The Rigsbys argue that the Xactotal printout in the McIntosh flood claim file met this standard because it appeared deceptively to be a line-by-line estimate, when in fact it only estimated the value of the McIntosh home based on its square footage and construction quality. State Farm responds that the Xactotal printout cannot be a false record because it was a true and correct document that was properly a part of the McIntosh file and was not intended to deceive the government.[16]

We agree with the district court that evidence adduced at trial could lead a reasonable jury to believe that State Farm deliberately or recklessly did not comply with FEMA directive W5054. To cite just one example, State Farm's principal FEMA contact, Juan Guevara, wrote in an email shortly after W5054 was circulated that the directive required a line-by-line estimate for a building like the McIntosh home. And the Xactotal printout for the McIntosh claim so closely resembled a line-by-line estimate that former FEMA adjuster Gerald Waytowich—who testified on behalf of State Farm—confused it for one. The jury could reasonably have believed that the printout was material, and was placed in the file to mislead FEMA in violation of § 3729(a)(1)(B).

---

[16] The Rigsbys also argue that the omission of the Ford Report from the NFIP file triggered liability under § 3729(a)(1)(B). Because we conclude that the submission of the Xactotal printout supports a violation of § 3729(a)(1)(B), we do not reach this issue.

No. 14-60160

## III. CONCLUSION

We therefore REVERSE the district court's decision to deny the Rigsbys additional discovery, but AFFIRM that court's decisions with respect to the seal violations, subject matter jurisdiction, and State Farm's motion for judgment as a matter of law. The case is REMANDED for further proceedings not inconsistent with this opinion.