**UNITED STATES of America EX REL., Victor E. BIBBY and Brian J. Donnelly, Relators/Plaintiffs**

v.

**WELLS FARGO BANK, N.A., individually and as s/b/m with Wells Fargo Home Mortgage, Inc., et al., Defendants.**

**CIVIL ACTION NO. 1:06–CV–0547–AT**

United States District Court,
N.D. Georgia, Atlanta Division.

Signed November 25, 2015

---

Amy L. Berne, Office of United States Attorney, Paris A. Wynn, U.S. Attorney's Office, James Edward Butler, Jr., Robert Henry Snyder, Jr., Butler, Wooten, Cheeley & Peak, LLP, Marlan Bradley Wilbanks, Tyrone M. Bridges, Wilbanks & Gouinlock, Atlanta, GA, Brandon L. Peak, Butler, Wooten, Cheeley & Peak, LLP, Joseph Marshall Colwell, Butler, Wooten, Fryhofer, LLP, Columbus, GA, Mary Louise Cohen, Phillips & Cohen, LLP, Washington, DC, for Relators/Plaintiffs.

Amy Pritchard Williams, Sara Salehi Ash, K & L Gates, Charlotte, NC, Charles T. Huddleston, Nelson Mullins Riley & Scarborough, LLP, Atlanta, GA, Lawrence Coe Lanpher, Soyong Cho, K & L Gates, Washington, DC, for Defendants.

## *ORDER*

Amy Totenberg, United States District Judge

This False Claims Act ("FCA") case centers on Relators' allegations that Wells Fargo Bank, N.A. ("Wells Fargo") en-

gaged in a fraudulent scheme to overcharge veterans on closing costs when those veterans refinanced their mortgages through the United States Department of Veterans Affairs ("VA") Interest Rate Reduction Refinancing Loan ("IRRRL") program. Relators developed their knowledge and understanding of the allegedly industry-wide fraudulent scheme through their experiences working as mortgage brokers who exclusively closed VA loans across Southern states extending from North Carolina to Texas and over the course of nearly a decade. (Relators' Amendment to the Second Amended Complaint by Restatement, Doc. 468 ("TAC") ¶ 6.)

## I. Background

Four years ago, Wells Fargo moved to dismiss Relators' Second Amended Complaint (Doc. 54; "SAC") for failure to plead fraud with particularity. Fed. R. Civ. P. 9(b). Wells Fargo argued that Relators had failed to sufficiently plead "any conduct by Wells Fargo sufficient to establish liability under the FCA and ... [did] not identify any false claims, as 'claims' are defined in the FCA." (Doc. 168 at 3.) Notably, Wells Fargo did not seek dismissal of part of the case on the basis that Relators operated in a single region of the United States or that Relators had closed their mortgage brokerage office in 2010, though these facts were known in 2011. (*See* Doc. 168.)

In its Order granting in part and denying in part that motion, this Court made the case-by-case determination required when evaluating a complaint for compliance with Rule 9(b). The Court found that

Relators had satisfied Rule 9(b) with respect to their claims[1] that Wells Fargo falsely certified legal compliance with VA fee regulations,[2] because the Complaint's allegations manifested sufficient "indicia of reliability based on Relators' active role as agents in preparing the mortgage paperwork necessary to obtain the guarantees that later culminated in claim submissions." (Doc. 317 at 17–18 ("Order").) Thus, the Court found that Relators had alleged plausible facts and allegations, that when construed in light of their substantial experience as mortgage brokers, met Rule 9(b)'s particularity requirement.

First, Relators exclusively handled VA loans in the course of their business across a broad swath of the South extending to Texas. They closed many thousands of VA loans over nearly a decade. (TAC at ¶ 54.)[3] During their years of experience as mortgage brokers, they helped prepare VA mortgage documentation for veterans' loans. Relators alleged they received express instructions from banks, including Wells Fargo, about how to cloak the charging of attorney's fees and thereby perpetrate Defendant's alleged scheme. (TAC ¶¶ 56–57.) Specifically, Relators had "received instructions from Defendant not to show the attorney's fees charge on" documentation sent to borrowers, "but rather to add the expected attorney's fees to the charge shown for title examination." (Order at 18.) Relators then obtained a copy of the final settlement statement for each loan closing, "and these documents confirmed the concealment of unauthorized attorney's fees" charged to borrowers. Thus, Relators "made factually specific al-

---

**1.** *See* 31 U.S.C. § 3729(a)(2) (2008).

**2.** *See* 38 C.F.R. § 36.4313 (listing allowable closing fees for VA loans).

**3.** While the Court relies only on the allegations of the Plaintiff's complaint, it notes that

testimony before the Court in other proceedings in this matter was consistent with this allegation. (*See* Doc. 445 at 79:21–24 ("The Court: Approximately how many veterans' loans would you deal with in a typical year? [Victor Bibby]: It would depend on the year. Some years we did thousands."))

legations regarding the mechanics of Defendant's routine practice of creating false documents and making false statements to the VA in order to obtain guarantees on loans that were not qualified for a guaranty under VA regulations." (Order at 22.) Relators allegedly saw Wells Fargo's "routine practice" in operation over and over again, over the course of many years.

The Court also found Relators satisfied the requirement to plead with particularity that Defendant's "false statements ultimately led the government to pay amounts it did not owe." *Hopper v. Solvay Pharmaceuticals, Inc.,* 588 F.3d 1318, 1330 (11th Cir.2009). Relators' quasi-insider status provided them with insight into Wells Fargo's "alleged mode of concealment" of fees, which appeared to the Court to be "particularly designed to give the semblance of regulatory compliance" needed to obtain a VA guaranty. (Order at 23.) Relators pled statistical data suggesting that a large number of VA IRRRL loans ended up in default, resulting in massive losses to the VA. (*Id.* at 23.)[4] Finally, Relators "specifically described an example loan involving Defendant where Defendant charged unlawful attorney's fees to the veteran, falsely certified compliance with VA regulations on authorized closing costs, obtained the VA guaranty on the basis of that false certification," and that loan was subsequently foreclosed on, requiring the expenditure of VA funds. (*Id.*)

Given these allegations, the Court did not limit Relators' claims to a specific region of the country and did not impose a cutoff date that excluded loans originated after a certain time. Nor did Wells Fargo argue for such limitations. The parties began to engage in—and continue to engage in—wide-ranging discovery covering Wells Fargo loans originated nationwide.

Now, four years after Wells Fargo filed its original motion to dismiss, it seeks to shut the stable door after the horses have already bolted. In its Motion for Partial Judgment on the Pleadings (Doc. 591; "Motion"), Wells Fargo argues for dismissal of Relators' FCA claims for all loans originated outside the seven states that Relators operated in as mortgage brokers, and for all loans originated after 2010, when Relators closed their mortgage brokerage firm. For the reasons provided herein, the Court **DENIES** Wells Fargo's Motion for Partial Judgment on the Pleadings [Doc. 591], and **GRANTS IN PART** and **DENIES IN PART** its Motion for Protective Order [Doc. 591].

## II. Standard

"Judgment on the pleadings is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." *Hawthorne v. Mac Adjustment, Inc.,* 140 F.3d 1367, 1370 (11th Cir.1998) (citing Fed. R. Civ. P. 12(c)). The legal standard for assessing a motion for judgment on the pleadings is the same as the standard for a motion to dismiss under Rule 12(b)(6).[5] *Id.*

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Bell Atlantic v. Twombly,* 550 U.S. 544, 555–556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); Fed. R. Civ. P. 12(b)(6). The plaintiff need only give the defendant fair notice of the plaintiff's claim

---

4. Consistent with Relators' allegations, most of the other banks sued entered into significant settlements. Only Wells Fargo and MIC proceeded.

5. The Court does not consider factual material outside the scope of the pleadings for the purposes of this motion, including that submitted by Relators in their Response. (Doc. 604.)

and the grounds upon which it rests. *See Erickson v. Pardus*, 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); Fed. R. Civ. P. 8(a). In ruling on a motion to dismiss, the court must accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *See Hill v. White*, 321 F.3d 1334, 1335 (11th Cir.2003).

A claim is plausible where the plaintiff alleges factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The plausibility standard requires that a plaintiff allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" that supports the plaintiff's claim. *Id.* at 556, 127 S.Ct. 1955. A complaint may survive a motion to dismiss for failure to state a claim even if it is "improbable" that a plaintiff would be able to prove those facts and even if the possibility of recovery is extremely "remote and unlikely." *Id.*

■ This standard must be imposed alongside the requirements of Rule 9(b). *United States ex rel. Cafasso v. General Dynamics C4 Systems*, 637 F.3d 1047, 1055 (9th Cir.2011) (FCA complaints must comply with both Rule 8(a) and Rule 9(b)). The Eleventh Circuit requires False Claims Act violations to be pled with particularity under Rule 9(b), and so Relators' Third Amended Complaint must set forth facts as to the who, what, when, where, and how of the fraud. *See Hopper*, 588 F.3d at 1324; *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1222 (11th Cir.2012).

■ Finally, the Court notes that it is important to keep in mind the purposes of Rule 9(b). It serves to "provide defendant with fair notice of claim, to safeguard de-fendant's reputation, and to protect defendant against the institution of strike suits," *United States ex rel. Rigsby v. State Farm Fire & Cas. Co.*, 794 F.3d 457, 467 (5th Cir.2015) (citation and quotations omitted), and serves a "screening function, standing as gatekeeper to discovery, a toll to weed out meritless fraud claims sooner than later." *Id.* (citation and quotations omitted); *see also United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359–60 (11th Cir.2006) (describing purposes of Rule 9(b)). And Rule 9(b) must be applied in a "nuanced" fashion on a "case-by-case" basis. *United States ex rel. Mastej v. Health Mgmt. Assoc., Inc.*, 591 Fed.Appx. 693, 704 (11th Cir.2014).

### III. Discussion

#### A. Waiver of Rule 9(b) Arguments

The Court must first address Relators' contention that Wells Fargo waived its Rule 9(b) arguments by failing to raise them until late in the proceedings. The Court recognizes the appeal of this argument. It seems unfair—not to mention inefficient—to allow a party to wait until several years after it has already answered and responded to discovery to raise a Rule 9(b) challenge. Nonetheless, case law and the Federal Rules suggest that Wells Fargo's course of action is permitted.

■ The reason a party may wait to raise a Rule 9(b) argument is because such a challenge is functionally the same as raising the defense that the opposing party has not stated a claim upon which relief may be granted. *Seattle–First Bank v. Carlstedt*, 800 F.2d 1008, 1011 (10th Cir. 1986) ("The dismissal of a complaint or counterclaim for failing to satisfy the requirements of Rule 9(b) is treated as a dismissal for failure to state a claim upon which relief can be granted under Fed. Rules Civ. P. 12(b)(6)"); *see also Vess v. Ciba–Geigy Corp., USA*, 317 F.3d 1097,

1107 (9th Cir.2003) (dismissals under 9(b) and 12(b)(6) are "functional equivalent[s]" to be "treated in the same manner").

■ This defense may be raised "in any pleading," "by a motion under Rule 12(c)," or "at trial." Fed. R. Civ. P. 12(h)(2)(A)-(C). Thus, a Rule 9(b) deficiency may be resolved at summary judgment or by another type of motion late in litigation. *See Brooks v. Blue Cross and Blue Shield of Florida, Inc.,* 116 F.3d 1364, 1368 (11th Cir.1997) (insurer defendants moved for both summary judgment and dismissal, and raised a Rule 9(b) defense); *United States ex rel. Schwartz v. Coastal Healthcare Group, Inc.,* 232 F.3d 902 at *4 (10th Cir.2000) (table decision).

Accordingly, while courts have occasionally found that a party has waived its Rule 9(b) defense, this is generally because a judgment was entered prior to the defense being raised. *Payne v. U.S.,* 247 F.2d 481 (8th Cir.1957) (Rule 9(b) challenge raised after trial); *see also Great American Indemnity Co. v. Brown,* 307 F.2d 306, 308 (5th Cir.1962) (party waived objections to pleading of special damages when it raised argument for first time on appeal, after entry of judgment).

■ Relators do cite a handful of cases supporting the proposition that Wells Fargo waived its Rule 9(b) defense because it failed to raise it earlier in this matter. *E.g., Davsko v. Golden Harvest Products, Inc.,* 965 F.Supp. 1467, 1474 (D.Kan.1997). But Relators provide no circuit authority for this argument. It is undoubtedly the case that under certain circumstances, a party can attempt to advance a new Rule 9(b) argument too late. *E.g., Payne,* 247 F.2d at 485–86 (party waived Rule 9(b) challenge by not presenting it until after judgment). And certainly a Rule 12(c) motion can be rejected by a Court if not made "early enough to [avoid the] delay [of] trial." Fed. R. Civ. Proc. 12(c). But because Rule 12(h) specifically preserves a party's ability to raise the defense of failure to state a claim up to and including "at trial," and because a Rule 9(b) challenge is treated the same as one for failure to state a claim, the Court is compelled to find that Wells Fargo has not waived its Rule 9(b) arguments. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2nd Cir. 1994) (rejecting argument that defendants waived Rule 9(b) because "defenses and objections that are irrevocably waived by answering an original complaint are those that involve[ ] the core issue of a party's willingness to submit a dispute to judicial resolution," such as objections to lack of personal jurisdiction, not those that involve "an effort to achieve judicial resolution of the controversy") (citation and quotations omitted).

## B. Wells Fargo's Rule 9(b) Arguments

The Court therefore turns to the merits of Wells Fargo's Rule 9(b) argument. In a nutshell, Wells Fargo argues that because Relators brokered loans with Wells Fargo only through 2010, and only in seven Southern states, Relators' claims lack the indicia of reliability necessary to plead a (1) nationwide scheme (2) extending beyond the date that they closed their mortgage brokerage doors in 2010. They thus argue for a geographic and temporal limitation to the scope of this case. The Court addresses these two proposed limitations in turn.

In so doing, the Court is mindful that it must evaluate whether the "allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis." *Mastej,* 591 Fed.Appx. at 703 (citing *Atkins,* 470 F.3d at 1358). The specific facts of this case—where quasi-insiders played a critical role in the VA mortgage closing process that allowed them to observe and examine Defendant's alleged fraud for almost a decade, across a large swath of the country, and where they allegedly were directed by mortgage in-

dustry defendants as to how to perpetrate that fraud—require the Court to reject dismissal.

### 1. Geographic Scope

Wells Fargo first argues that Relators' claims should be limited to the South. Wells Fargo claims that (1) Relators did not operate outside of this region; (2) other states have differing loan closing regimes that Relators are not experienced with; and (3) loan closing fee rules and VA fee rules vary from state to state. It argues that each of these facts undercuts the Complaint's "indicia of reliability" regarding the fraudulent scheme for loans originated outside the South. The Court addresses each of these contentions.

### a. Regional versus National Claims

"[C]ourts have found that allegations of specific claims in one state or region satisfy 9(b) requirements by establishing a nationwide inference of fraud." *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F.Supp.2d 125, 174–75 (E.D.Pa. 2012) (allegations that numerous false claims originated from Puerto Rico and four other states were sufficient to allege a nationwide scheme); *United States ex rel. Carpenter v. Abbott Laboratories, Inc.*, 723 F.Supp.2d 395, 409410 (D.Mass.2010) (allegation that false claims were submitted in one state sufficient to support claims in twelve other states); *United States ex rel. Rost v. Pfizer, Inc.*, 253 F.R.D. 11, 15–17 (D.Mass.2008) (complaint that alleged that 200 false claims were submitted in Indiana was sufficient to allege nationwide scheme, although district court limited discovery initially to sales region containing Indiana, and reserved issue of nationwide discovery); *United States ex rel. Bilotta v. Novartis Pharm. Corp.*, 50 F.Supp.3d 497, 513 (S.D.N.Y.2014) (rejecting defendant's

assertion that complaint was deficient because it "rel[ied] on only a handful of sham speaker events as examples of [an] alleged nationwide kickback scheme"); *United States ex rel. Pogue v. Diabetes Treatment Centers of America, Inc.*, 238 F.Supp.2d 258, 268 (D.D.C.2002) (allegations that a fraudulent scheme was nationwide and occurred over twelve years were sufficient, despite the fact that "the only specific place mentioned is [a single hospital]"); *see also United States ex rel. Hudalla v. Walsh Const. Co.*, 834 F.Supp.2d 816, 822–23 (N.D.Ill.2011) (rejecting 9(b) challenge as relator sufficiently pled that defendant used fraudulent billing practices in connection with construction of housing projects, and those allegations could fairly be considered to encompass housing projects not specifically named in complaint).

■ Here, Relators allege a "scheme to defraud ... our nation's veterans and the United States treasury." (TAC ¶ 2.) The Complaint addresses a national VA program available to "all veterans who currently have a VA home loan." (TAC ¶ 30.) Relators allege "hundreds of thousands of false and fraudulent documents" were submitted by Wells Fargo as part of this scheme. (TAC ¶ 5.) Nothing about the TAC remotely suggests it is cabined to the seven states that Relators operated in. Instead, it is replete with references to a scheme to defraud the "nation['s]" and "country's" veterans (TAC ¶¶ 2, 114), discusses "national data" about the reasonableness of title fees (TAC ¶ 61), and the "nationwide" default rate for IRRRL loans. (TAC ¶ 78.) Relators also plead an exemplar false claim that resulted in an actual payment by the VA. (Doc. 54–1; 54–2.)[6] And they allege damages in terms that are national in scope. (*See* TAC ¶ 48.)

---

6. Because Relators' TAC was an "amendment to the Second Amended Complaint" by restatement, they did not attach the exemplar claims as exhibits to the TAC. However, this

Court is permitted to consider documents attached to an original complaint, even if not included in an amendment. *Gross v. White*,

■ The Complaint therefore makes plain that it alleges a nationwide scheme, with nationwide impact. The parties themselves were obviously aware of the Complaint's scope, as they began engaging in nationwide discovery after this Court first denied dismissal. Thus the core purpose of Rule 9(b)—to give Wells Fargo fair notice of the nature and contours of Relators' claims—was met.[7]

The particular facts and circumstances of this case all point to a Complaint with the hallmarks of "reliability." Relators have years of experience in the mortgage industry in general, and with the fraudulent scheme alleged in the Complaint in particular. That experience spans across almost the entire South all the way to Texas, which many might consider also a part of the West (and which Texans might consider a region unto itself). As brokers, they allege they were cogs in the machine that resulted in routine charging of illegal fees in violation of VA regulations. Far from viewing Relators' experiences as a mortgage broker in "only" seven states as a negative, the Court views that experience as a positive indicator that Relators have knowledge sufficient to lend their allegations the "indicia of reliability" needed to infer the existence of a nationwide scheme. The reasonable inference to draw here is that if the alleged violations of a national VA fee ban were occurring in seven states—including four of the ten most populous states in the nation in Texas, Florida, Georgia, and North Carolina— such conduct is likely to have occurred nationwide. There would be no reason to think that this commercial conduct was confined just to one region of the country. This inference of nationwide conduct has been drawn by other courts in similar situations. *E.g.*, *CVS Caremark Corp.*, 913 F.Supp.2d at 177–78 ("the sheer number of claims identified by Plaintiff in at least three states and Puerto Rico suggests, without need for speculation, that Defendants' reporting practices likely occurred . . . throughout the country"); *Pogue*, 238 F.Supp.2d at 268 (where Relator "set out a sufficiently "detailed description" of the specific scheme and its falsehoods, his allegation that the scheme was nationwide was sufficient despite only mentioning one specific hospital where false claims were submitted).

Wells Fargo cites *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 719 F.3d 31 (1st Cir.2013) ("*Duxbury II*") in support of its argument that Relators' claims should be geographically limited. But *Duxbury* presents an inverted image of this case. In the first *Duxbury* case, the First Circuit reversed the district court's Rule 9(b) dismissal of prescription drug-related kickback claims and stated that allegations that eight medical providers in the western United States had submitted false claims "support[ed] a strong inference that such claims were filed nationwide." 579 F.3d 13, 31 (1st Cir.2009) ("*Duxbury I*"). On remand, the district court exercised its considerable discretion over the discovery process and limited discovery to the Western region of the United States where the eight identified medical providers were located; the relator then failed to find *any* admissible evidence supporting her remaining allegations. *Duxbury II*, 719 F.3d at 39. The First Circuit thus declined to find that the district court abused its discretion to manage the contours of discovery because "any inferential

---

340 Fed.Appx. 527, 534 (11th Cir.2009) ("district court ruling on a motion to dismiss is not required to disregard documents that the plaintiff himself filed with his original complaint.")

7. The Parties provided each other with discovery consistent with the national scope of the Complaint.

support ... for the amended complaint's nationwide allegations evaporated upon Duxbury's failure to uncover any admissible evidence to support even her more modest regional kickback claims." *Id.* Taken together, the two *Duxbury* cases suggest only that (1) allegations that false claims were submitted at eight medical providers are sufficient to infer a nationwide scheme but (2) a district court is empowered—but not required—to initially limit discovery in a FCA case to a confined region before expanding it nationwide.

Here, Wells Fargo did not initially seek dismissal for claims on a regional basis. Nor, at the outset of discovery, did it seek to limit claims geographically. (*See* Doc. 325 (Joint Preliminary Report); Doc. 333 (Motion for Partially Phased Discovery Process (seeking to limit discovery to "Notice of Default" only loans, but not seeking geographic limitations)); Doc. 343 (Transcript of first Scheduling Conference, held on February 6, 2013).) This is telling on its own; it indicates Wells Fargo did not see a basis for arguing for regional differences. Without such an argument or request early in the case, the Court saw no need to consider limiting discovery geographically, given the scope of Relators' Complaint. The proceedings so far have not given the Court cause to reconsider its decision to not limit discovery geographically. The First Circuit gave the relator in *Duxbury* a shot at uncovering evidence supporting her claims, which may have then supported nationwide discovery, and she missed. In the Court's judgment, and based on the Court's familiarity with this case over the past several years, it is unlikely the same has occurred here, especially given the discovery disputes and information thus far presented to the Court by the parties' counsel.[8]

#### b. Differences in Closing Regimes Between States

Wells Fargo also argues that the TAC lacks sufficient indicia of reliability because other states have legal regimes governing the closing of mortgage loans that are significantly different than those in the seven states Relators operated in. In particular, Wells Fargo differentiates between "table closing" states (mostly located on the East coast or in the South) that typically require the presence of attorneys at the loan closing, and "escrow closing" states on the West coast where non-attorneys may close loans. (Motion at 14–15.)

But as Wells Fargo's own brief indicates, the seven states Relators operated in had a variety of legal regimes too, including both escrow closing and table closing regimes. *Compare Williams v. Land Title Co. of Dallas*, 1997 WL 196345 at *5 (Tex.App. Apr. 23, 1997) (discussing Texas' escrow closing practice, which does not require an attorney to close loans) with *In re UPL Advisory Opinion 2003–2*, 277 Ga. 472, 588 S.E.2d 741 (2003) (requiring attorneys to conduct loan closings); (TAC ¶ 6) (alleging that Relator Bibby is licensed in seven states including Georgia and Texas). It is hard to give credence to the argument that it matters that "the kinds of fees commonly charged in connection with mortgage closings differ[ ] between ... attorney-closing states in the southeast and other parts of the country where ... title-company closing is common," (Motion at 16) when it appears from the Complaint that Relators had experience with both kinds of closing arrangements. And in any event, the Court is not persuaded, without solid legal authority, that differences in state law impacting the *proof* required to prevail at trial on particular false claims (such as whether a fee was

---

8. The Court does not rely on such information for the purposes of determining whether the Complaint has met Rule 9(b)'s standards and should thus survive Wells Fargo's Motion.

reasonable and customary) necessarily impact the *pleading standard* applicable to such claims, when those claims are founded on a federal regulation that prohibited the charging of attorneys fees nationwide. *See* 38 C.F.R. § 36.4313.

### c. Differences in VA Closing Fee Rules

It may also be the case that "closing rules and even VA closing fee rules are not uniform across the fifty states." (Motion at 18.) However, the Court reads the allegations in paragraph 52 of the TAC, which Wells Fargo argues incorrectly describe VA closing fee rules as uniform, as instead mostly describing the process of obtaining a VA guaranty. In fact, the allegations allow for and acknowledge different closing processes—and indicate familiarity with such differences. (TAC ¶ 52 ("if the loan is not cancelled, the attorney/title company completes the funding of the loan").) In any event, the Court is not convinced that differences in state law sufficiently undercut the core allegations of the Complaint or kneecap Relators' reliability in such a way as to invoke the concerns that motivate Rule 9(b). As mortgage professionals with nearly a decade of experience brokering Wells Fargo VA loans in an expansive, populous region of the United States, Relators have alleged enough factual material to support the inference that Wells Fargo engaged in a nationwide scheme.

After reams of filings and days of status conferences addressing these issues, the Court is more than aware that this is primarily an evidentiary issue. This is all the more clear to the Court after the sustained discussions regarding the Relators' Requests for Admissions (served this past summer) which required the parties and the Court to grapple with a range of issues involved in identifying loans where attorneys' fees were impermissibly charged to veterans. The Court therefore anticipates that the issue regarding differing closing rules and VA closing fee rules will present itself again at summary judgment, where it can be properly heard as the primarily evidentiary issue that it is.

Finally, it is plain that Rule 9(b) served its purpose with respect to the geographic scope of this matter back when this Court ruled on Wells Fargo's original motion to dismiss. Relators' presentment claims, which were not sufficiently pled, were dismissed. Relators' false documents claims were sufficiently pled, and the parties then began engaging in discovery that was *nationwide in scope*. It beggars belief that Wells Fargo lacks fair notice of the national scope of this matter, when the parties are now three years into discovery that has proceeded exactly as if this suit is nationwide. *See Rigsby,* 794 F.3d at 467 (applying Rule 9(b) served no purpose after district court conducted a trial on a single sample claim). Nor can Relators' Complaint—whatever its ultimate result—be credibly called a strike suit. *Id.* None of the core purposes served by Rule 9(b) would warrant dismissal here.

### 2. Temporal Limitation

Wells Fargo also argues that Relators' claims lack sufficient indicia of reliability to satisfy Rule 9(b) for loans originated after 2010 because Relators "stopped originating loans for Wells Fargo" by the end of that year. (Motion at 10.) They rely primarily on the Eleventh Circuit's unreported decision in *United States ex rel. Mastej v. Health Mgmt. Assoc., Inc.,* 591 Fed.Appx. 693 (11th Cir.2014). Wells Fargo also argues that the closing process changed post–2010 in the wake of changes to federal regulatory requirements and that this too undercuts Relators' reliability.

The Court first addresses Wells Fargo's *Mastej* argument. In *Mastej,* the relator was employed by one of the defendants for several years, up through October of 2007. He first served as Vice President of a

corporation that operated dozens of hospitals, and then as CEO of one of those hospitals. He alleged that two defendants—the corporation he worked at and its subsidiary—made payments to ten doctors to induce them to refer patients for treatment at the defendants' medical center, in violation of anti-kickback laws, and then violated the FCA by certifying that they had complied with all such laws when submitting Medicare claims. 591 Fed. Appx. at 705. However, he only alleged that the fraud began in 2007—shortly before his employment ended.[9] Importantly, the relator "failed to identify a single patient" referred by one of the doctors who received a kickback, and failed to identify "a single interim claim form for a referred patient, the dates and amounts of any claims submitted ... or a single certification involving referred patients rendered false by" the kickback scheme. *Id.* at 703. The defendants moved to dismiss the complaint at the outset of the case for failure to plead with particularity. The district court dismissed the case, but granted leave to amend. *United States ex rel. Mastej v. Health Mgmt. Assoc., Inc.*, 869 F.Supp.2d 1336, 1347 (M.D.Fla.2012). After relator amended[10] his complaint, defendants promptly moved to dismiss again.

The district court dismissed the case for a second time. On appeal, the Eleventh Circuit reversed in part, finding that the relator had pled some allegations with sufficient particularity to satisfy Rule 9(b). Specifically, the Eleventh Circuit held that the complaint satisfied Rule 9(b) for claims submitted during 2007, when the relator was still employed by a defendant. 591

Fed.Appx. at 708–709. He was able to clear Rule 9(b)'s hurdle despite failing to submit a single representative claim because of his status as a corporate insider "heavily engaged in the Defendants' business and revenue operations." *Id.* at 709. However, because he did not allege a representative claim and because he alleged the "submission and payment of ... interim claims only in a generalized and conclusory manner ... [that did] not satisfy Rule 9(b)'s particularity requirement," relator's claims for the 2008 and 2009 calendar years were properly dismissed. *Id.* at 710. His reliability was derived wholly from his position as an insider. And although the relator had been employed by the defendant for several years, he only alleged that the false claims were submitted starting in "[e]ach year since 2007"—meaning he witnessed the alleged submission of claims for roughly ten months. *See id.* at 699. All told, the relator in *Mastej* had a brief, months-long glimpse into the alleged fraudulent scheme, after which the door slammed shut when his employment ended. Without a representative claim, and with only his insider status to rely on, he was unable to meet Rule 9(b)'s requirements for all of his claims.

In deciding *Mastej*, the Eleventh Circuit made plain that it was not setting forth a broad rule or making any alterations to the pleading standard already applicable to FCA claims. *See id.* at 709. It emphasized, repeatedly, that it was applying the "nuanced, case-by-case basis approach" required by Rule 9(b). *Id.* at 704. And it was especially careful to note that it did "not suggest, much less hold, that a *qui*

9. *United States ex rel. Mastej v. Health Mgmt. Assoc., Inc.*, No. 11–cv–0089, Amended Complaint, Doc. 79 at ¶ 39 (March 3, 2012) ("Each year since 2007 and continuing through the filing of the Original Complaint, HMA· and Naples HMA submitted Hospital Cost Reports that false represented compliance with Medicare regulations and laws.")

10. The operative complaint on appeal was the third amended complaint, as relator had amended his complaint once before serving defendants, and then again with leave from the court.

*tam* plaintiff-relator can never base his case on false claims submitted after he left a defendant's employ." *Id.* at 709.

In fact, the Eleventh Circuit has previously held that the mere fact that an individual's connection to an alleged fraudulent scheme has terminated does not mean that he cannot plead that the scheme continued after that time. For example, in *United States ex rel. Walker v. R & F Properties of Lake County, Inc.*, the Eleventh Circuit reversed a district court's order limiting a relator's discovery to the term of her employment. 433 F.3d 1349, 1359 (11th Cir. 2005). The relator alleged that the defendant submitted false claims "from at least the time of [relator's] hiring into the undefined future." *Id.* at 1359. Because the complaint alleged an "ongoing practice of false billing," discovery was permitted for three years [11] past the term of the relator's employment. *See id.; see also United States ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204, 207 (E.D.Tex.1998) (denying motion to dismiss complaint that alleged that false claims were submitted from "1988 to the present.") Thus, a relator's allegations that violations are continuing may be sufficient to support potential liability beyond the date of the relator's employment if the relator's allegations in totality, with due consideration of relator's information gleaned through employment, have supplied sufficient indicia of reliability to plead the overall scheme.

Most importantly, the court must consider all the facts alleged and apply the "nuanced, case-by-case approach" required by Rule 9(b) when determining whether dismissal is appropriate. *See Mastej*, 591 Fed.Appx. at 709. Thus, in *United States ex rel. Harris v. Bernad*, a relator's allega-

tions that a "defendants' fraudulent scheme began in 1993 and continues into the present" were sufficient because "defendants' scheme is complex and has lasted for a number of years." 275 F.Supp.2d 1, 8 (D.D.C.2003); *see also United States ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 123–24 (D.C.Cir.2015) (allegations that AT & T perpetrated a nationwide scheme to overbill libraries and schools for telecommunications services from 1997 through 2009 were sufficient); *United States ex rel. Head v. Kane Co.*, 798 F.Supp.2d 186, 205–206 (D.D.C.2011) (allegations that one of several alleged fraudulent schemes continued "until the present time" were sufficient, even though relator had been terminated years prior; relator had worked for one of defendants for eight years).

 Here, Relators allege that over one million IRRRL loans were guaranteed by the VA from "2001 to the present." (TAC ¶ 78.) Most of the allegations about damages identify statistical evidence from 2001 through 2010. (*E.g.*, TAC ¶ 85.) But the Complaint alleges continuing violations, phrased in the present tense (TAC ¶ 86 ("lenders are adding illegal fees to the IRRRL loans and fraudulently inducing the Government to guarantee the loans")), occurring over "a course of years." (TAC ¶¶ 112, 122 ("the Government has been damaged and will continue to be damaged as tens of thousands of VA loans which contain unallowable fees go into default").) Significantly, Relators have nearly a decade of experience brokering VA loans for Wells Fargo to draw on when alleging a continuing scheme. They personally observed and participated in the scheme as a standard business protocol, for years on end.[12] (*E.g.*, TAC ¶ 57.) Unlike the rela-

---

11. The original complaint in *R & F Properties* was filed on May 6, 2002. Case No. 02–cv–0131–WTH, Doc. 1.

12. The Court does not rely on the information and documents produced in this case during the parties' numerous discovery disputes in reaching the legal issues posed by Defendant's

tor in *Mastej,* they do not have all of roughly ten months of observation of the submission of false claims to draw on;[13] instead, they have nearly a decade of experience observing the alleged fraud, and closed "thousands of VA IRRRLs" during the course of their work for their brokerage. (TAC ¶ 54.) Relators' persistent exposure to the alleged fraudulent scheme, sustained over the course of several years, allows them to allege that the scheme continued past the date that their mortgage brokerage operated under the specific circumstances presented here. *See United States ex rel. Oughatiyan v. IPC Hospitalist Company, Inc.,* 2015 WL 4249195 at *2–3 (N.D.Ill. July 14, 2015) ("the allegations contained in the government's complaint are largely derived from data ... related to [defendant's] operations from January 1, 2003 to ... December 2010. These later allegations, read together with the 'to present' language found in the ... complaint ... can be fairly construed to allege an ongoing wrong even after 2010.")

Wells Fargo also argues that changes to the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605 *et seq.,* which resulted in alterations to the HUD–1 form effective January 1 2010,[14] means that "Relators' experience brokering loans for Wells Fargo prior to January 2011 does not establish any indicia of reliability concerning Wells Fargo's origination practices after that time period," and that the Complaint "contains no allegations concerning Wells Fargo's closing practices since Relators ceased brokering loans through USFS in December 2010." (Motion at 12–13.) There are two problems

with this argument. The first is that Wells Fargo argues that changes in closing practices effective *January 1, 2010* mean that Relators lack reliability for closing practices after *December 2010.* But by its own terms this argument indicates that Relators had experience with the new closing practices and HUD forms for an entire year. This does not undercut Relators' reliability at all. Quite the contrary, it suggests that they have knowledge concerning the new HUD–1 and any accompanying changes to closing practices.

Second, although the HUD–1 form changed slightly in 2010, the Court is not convinced that it was such a significant alteration as to undermine the foundation of Relators' knowledge—which comes from their years of experience as mortgage brokers. This is especially so since Relators' brokerage apparently continued to operate into 2010, after the effective date of the HUD–1 change. And Wells Fargo does not argue that the VA's rules prohibiting attorney's fees changed substantively in the wake of the introduction of the new HUD–1.

This is not to say that Relators are guaranteed success on their post–2010 claims. The fact that the post–2010 HUD–1 provides somewhat less detail as to which title charges are being assessed may present more difficult issues of proof for Relators at the summary judgment stage. But what is being assessed here is the sufficiency of *allegations,* not an ultimate evaluation and weighing of *evidence.* Relators alleged a continuing scheme to circumvent and violate the VA regulations

---

motion but notes that this information echoes these same allegations in Relators' complaint.

**13.** As noted above, while the relator in *Mastej* had been employed by one of the defendants for years, he only began observing the fraudulent scheme near the end of his employment. *United States ex rel. Mastej v. Health Mgmt.*

*Assoc., Inc.,* No. 11–cv–0089, Amended Complaint, Doc. 79 at ¶ 39 (March 3, 2012).

**14.** For VA loans, lenders were given until May 2010 to adapt to the new requirements. VA Circular 26–10–01 (January 7, 2010) (Doc. 591–3.)

prohibiting the charging of attorney's fees to veterans. Those regulations have not changed. And the changes that did occur to the HUD–1 form do not strike the Court as being so revolutionary as to eliminate Relators' reliability concerning the nature of the alleged scheme.

A final note. This matter is before the Court on a Motion for Judgment on the Pleadings. In this posture, the Court cannot consider materials outside the pleadings. And yet the Court acknowledges—without relying on—the fact that the discovery process has resulted in uncovering some evidence that supports Relators' bundling allegations. (Transcript of June 22, 2015 Status Conference, Doc. 575 at 46: 4–5 (Counsel for Wells Fargo acknowledges that 34 out of 100 sample loans contained a bundling violation).) This evidence, of course, has no bearing at this juncture on whether or not Wells Fargo is *liable* under the FCA for such violations. But it does indicate to the Court that Relators' case is not a fishing expedition or "strike suit."

Wells Fargo has been on notice of the nature and scope of this suit. It has produced documents regarding loans outside the South and past 2010. What has been produced so far shows that Relators' allegations, whatever their ultimate end, are not spurious or baseless. Most importantly, the allegations in the Complaint are themselves legally sufficient under Rule 9(b), without considering the rest of the documents filed in this case. The gatekeeping function of Rule 9(b) has been met.

### 3. Limitation on Discovery

██ Wells Fargo also seeks, in the alternative, a protective order limiting discovery geographically and temporally. For the reasons already discussed, the Court **DENIES** Wells Fargo's Motion for a Protective Order to the extent it seeks a geographic or a temporal limitation starting in 2010. The Court **GRANTS THE MOTION IN PART** to the extent described below. The discovery sought has generally been relevant and tailored to the particular circumstances and allegations in this case as well as commensurate to the public importance and monetary value of the issues at stake.[15]

---

**15.** The Court notes that in *R & F Properties*, the Eleventh Circuit did not view the relator's employment period as the defining determinant of the temporal scope of the case, noting that false claims cases can, after all, be brought by individuals who have no employment relationship to the defendant. The decision did, however, limit discovery for the time period after the complaint was filed, without explanation. 433 F.3d at 1359. The Court presumes that this may have been based on the particular posture of that case, as it came to the Court after dismissal on summary judgment by the district court. It is plain that this temporal cutoff decision is again one that must be made on a case-by-case basis. Thus, courts have recognized that a party who alleges a continuing scheme may seek discovery past the filing of the original complaint, based upon the particular allegations and the factual circumstances of the case. *See Rigsby*, 794 F.3d at 467 (reversing a district court's denial of discovery because district court's application of Rule 9(b) after a sample claim had

been tried presented a "square peg/round hole problem;" the purposes of Rule 9(b) are "to provide ... fair notice of claim, to safeguard defendant's reputation, and to protect defendant against ... strike suits ... [which] are inapplicable in" such a context); *Oughatiyan*, 2015 WL 4249195 at *2–3 (permitting government to seek eleven years worth of discovery from seven states, through the date of its complaint in intervention (filed five years after relator's original complaint) because government's complaint alleged violations continued "to the present"); *United States ex rel. Fiederer v. Healing Hearts Home Care, Inc.*, No. 13–cv–1848, 2014 WL 4666531 at *5 (D.Nev. September 18, 2014) (granting a motion to compel discovery for six years of medical records despite fact relator was only employed for less than a month, because "[t]he court is unpersuaded by Defendants' argument that the scope of discovery permitted under Rule 26 should be limited to the duration of a relator's employment" as that would "plac[e] limits on *qui tam* actions that

Ultimately, Wells Fargo's concern is a discovery problem, not a pleading problem, about the burden imposed on Wells Fargo by discovery regarding loans originated in recent years. This burden invokes the proportionality concerns inherent in Fed. R. Civ. P. 26. Wells Fargo has previously sought to lessen that burden through its Motion to Share Costs. (Doc. 552.) Upon review of this issue anew in the context of the current motion, the Court recognizes sharing of costs is appropriate for discovery aimed at the years where the Relators' claims are far less likely to bear fruit. Their requests for production regarding loans *originated* after the Court denied Wells Fargo's first Motion to Dismiss [16] made clear that this case would proceed are less likely to yield helpful evidence supportive of their claims. At that point, Wells Fargo was on notice that this case would proceed through discovery, and it is reasonable to surmise that the company would take additional measures to eliminate the alleged conduct that led to Relators' claims.[17]

■■■ The Court denied Defendant's motion for a protective order on July 28, 2015 but allowed Wells Fargo to renew it at the appropriate time. (Doc. 593.) The July 28, 2015 Order placed the parties on fair notice that cost-sharing might be imposed in the future, if appropriate. The Court is familiar with the scope of work and expense required by the extensive document discovery in this case. As the likely value to this case of file production for loans originated on or after January 1, 2013 [18] is far less than loans produced prior to that date, the Court finds upon further review that cost-sharing is appropriate in connection with loan mortgage file production for the period following that date.

The Court does not, however, adopt Wells Fargo's arguments in its Motion to Share Costs (Doc. 552) that costs should be split for all loans that went to *claim* after January 1, 2013. This is because such a request would capture loans originated many years ago, during the heart of the liability period. The alleged "bad seed" of illegal fees was planted in those loans long before this Court provided notice that Relators' claims would proceed or before the seal was even lifted in this case. That seed only "ripen[s] into a claim actionable under the statute [after] a later event of legal consequence between the lender and government," such as foreclosure, and so it is no surprise that some loans that were originated years ago, during the height of the alleged fraudulent

do not exist for government-initiated actions" and "dissuade whistleblowing by limiting a relator's claim, not to the plausible allegations regarding the submission of false claims— which is the Act's focus—but to the duration of the relator's employment, on which the Act is silent").

16. (Order, Doc. 317, entered November 19, 2012.)

17. Based on prior discovery disputes, the Court is aware that Wells Fargo implemented an internal investigation and other measures some years earlier in response to smaller lawsuits concerning its mortgage practices. However, the potential scope and damages entailed in the instant False Claims Act case, once it survived a motion to dismiss, likely

served as a far greater incentive to change course than earlier, smaller lawsuits.

18. The Court selects this date for three reasons. First, it is a simple and easy cutoff. Second, it is less than 45 days after the Court's Order on Wells Fargo's original Motion to Dismiss, which, as described above, placed Wells Fargo on notice that Relators' claims might would proceed through full scale litigation. Third, this date is the same as that apparently discussed (but according to the Relators, never expressly agreed upon) by the parties during conversations about an appropriate cut-off date for discovery. (Doc. 521 at 30.) None of these reasons controls, but all indicate that this date is appropriate and fair.

scheme, only became part of this case recently after they went to claim. *United States v. Van Oosterhout*, 96 F.3d 1491, 1494 (D.C.Cir.1996). The practices associated with the origination of the loans prior to January 1, 2013 constitute the meat of this lawsuit. Based on the Court's handling of discovery disputes to date, the Court finds that Plaintiff's discovery efforts directed at these loans are reasonable and that cost-shifting is not appropriate. Accordingly, the Court finds cost-sharing for production of loans originated before January 1, 2013 is not warranted but that cost-sharing for production of loans originated on or after January 1, 2013 is appropriate.

Given the above considerations, the Court **ORDERS** the following:

1. Relators shall pay 50% of Wells Fargo's electronic discovery and document production costs for loans that were originated on or after January 1, 2013 and that were identified as going to default and claim (payment).[19] See Fed.R.Civ.P. 26(c); *FDIC v. Bowden*, No. 4:13–cv–245, 2014 WL 2548137 at *10 (S.D.Ga. June 6, 2014) (noting court's powers to impose protective orders conditioning production on the requesting party's willingness to bear cost of production). If Relators do not seek this discovery for the future or desire to abandon the pending post January 1, 2013 discovery requests, based upon this imposition of cost-sharing, they should notify Wells Fargo and the Court as soon as practically feasible.

2. The Court does not address at this time cost-sharing for any other discovery expenses related to loans originated on or after January 1, 2013, i.e., any Requests for Admissions and Interrogatories for those later loans. As the allocation of costs for responding to this additional dis-

covery may be more complex to compute than the "equal sharing" of costs for production of a defined number of files, the Court does not have sufficient information before it to address that question. But some form of cost-sharing, at minimum, may well be considered. The Court encourages the parties to discuss and reach an agreement regarding this topic. They should consider additionally whether it would be helpful to allow the Relators to review a sample of the post–2013 originated mortgages before proceeding with further discovery concerning these mortgage files.

3. Consistent with this Court's earlier orders, no discovery may be sought for any loans that did not go to claim up to and including May 1, 2015. (*See, e.g.*, Doc. 572 at 3.)

## IV. Conclusion

For the foregoing reasons, Wells Fargo's Motion for Judgment on the Pleadings Protective Order is **DENIED**. [Doc. 591.] Its Motion for a Protective Order, found in the same pleading, is **GRANTED IN PART** and **DENIED IN PART** as described above. [Doc. 591.]

**IT IS SO ORDERED** this 25th day of November, 2015.

---

19. In its original Motion to Share Costs, Wells Fargo sought an even split of expenses. (Doc. 552–1 at 2 ("fairness requires that Relators share in the significant *additional* electronic discovery and document production costs that Wells Fargo will incur."))